RACINE SEEDER Co. *v.* JOLIET WIRE-CHECK ROWER Co.  (Bill and Cross-Bill.)[1]

*(Circuit Court, N. D. Illinois.  April 5, 1886.)*

1. PATENTS FOR INVENTIONS—INFRINGEMENT MUST BE PROVED.

In a suit for infringement of the fourth claim of letters patent No. 76,003, of February 24, 1868, for a broad-cast seeder, the only proof as to the kind of machine made by the defendant was the testimony of a witness that the defendant was making a seeding-machine with two feeding holes and a disk. *Held,* "this proof does not make even a *prima facie* case of infringement without proof showing that the feeding holes and disk in defendant's machine perform the same function as those covered by the fourth claim of the Floyd patent."

2. SAME—EQUITY JURISDICTION.

As this patent was within about two months of its expiration at the time the bill was filed, *held,* that it was doubtful whether, under the rule in *Root v. Railway Co.,* 105 U. S. 189, the court had jurisdiction in equity, and the bill was therefore dismissed without prejudice to a suit at law.

3. SAME—BARGAIN—WHAT IS EVIDENCE OF.

Where parties had met and discussed the subject of the purchase by one of a patent from the other, but the terms of purchase were not fixed in the personal interview, but were subsequently settled by interchange of letters between the parties, *held,* that these letters were the evidence of what the bargain was.

4. SAME—ESTOPPEL.

A party who clothes another with the legal title to a patent, and relegates to the assignee the question as to who shall have the benefit of the purchase, is estopped to complain of fraud because another was not allowed to share in the benefit of such purchase.

5. SAME—ASSIGNMENT OF PATENT—CONVEYANCE BY RECORD OWNER VALID.

Where a party owning the title of record to a patent for over six months conveyed it for a valuable consideration to a corporation competent to purchase and hold it, and whose title was made a matter of record in the patent-office, *held,* that this title could not be attacked for fraud in the assignor to the corporation.

6. SAME—KNOWLEDGE OF ACT OF AGENT BINDS PRINCIPAL.

S. claimed that a bank had, against instructions, delivered a deed to a patent without payment of purchase money, instead of holding the deed as collateral to secure a note given in payment. It appeared that S. knew of the action of the bank, but took the note and discounted it. *Held,* that S. could not be allowed, even against his immediate assignee, to treat the deed as having been obtained by such fraud as would vitiate it.

7. SAME—PERSONAL LICENSE UNDER A PATENT, NOT ASSIGNABLE.

S. empowered H., by contract in writing, as his lawful attorney, to sell rights under a patent at prices to be approved by S. for the then unexpired term of the patent, and authorized H. to manufacture under the patent at a certain royalty, but reserved the power to revoke the contract in case H. should not faithfully perform his agreements under it. *Held,* that the contract, both as a power to sell and as a license, was a merely personal one, and not transferable by H. except with the consent of S., and that when S. parted with his title to the patent he parted with his right to sanction or vivify any assignment from H.

This was a bill to restrain infringement of two patents, one of which had about two months to run at the time the bill was filed. Defendant's answer denied infringement of one of the patents, and alleged that it was void for want of novelty, and admitted that the

[1] Edited by Charles C. Linthicum, Esq., of the Chicago bar.

other patent was valid, and that defendant used it, but insisted that the title belonged to the defendant. Defendant also filed a cross-bill setting up its title to the latter patent, and praying that complainant's title might be set aside as fraudulent and void, as against complainant in the cross-bill, and that the complainant in the cross-bill might be adjudged the lawful owner of said patent, and entitled to an accounting from the complainant in the original bill for infringement of said patent. The facts concerning the title to the patent are stated in the opinion.

*H. W. Wells* and *J. T. Fish*, for complainant.

*George S. House* and *Coburn & Thacher*, for defendant.

BLODGETT, J. The original bill in this case was filed to restrain the alleged infringement of patent No. 76,903, granted February 21, 1868, to P. G. and E. C. Floyd, for a "Broad-cast Seeder," and Patent No. 136,107, granted February 18, 1873, to J. W. Strowbridge, for a "Seeding-machine," of which patents the complainant claims to be the owner. Infringement of only the fourth claim of the Floyd patent is insisted upon, and as to this patent defendant denies any infringement, and insists that the patent is void for want of novelty.

There is no proof in the record as to the kind of machine made by defendant, and no proof of infringement except that the witness Dorr testifies that the defendant is making a seeding-machine with two feeding holes and a disk. This proof does not make even a *prima facie* case of infringement, without proof showing that the feeding holes and disk in defendant's machine perform the same function as those covered by the fourth claim of the Floyd patent. I therefore feel compelled to find that there is no proof of infringement of the Floyd patent; but as the main controversy in the case is centered about the other patent, and as this patent was within about two months of its expiration at the time the bill was filed, leaving it doubtful under the rule in *Root* v. *Railway Co.*, 105 U. S. 189, whether the court has jurisdiction in equity, I shall dismiss the bill without prejudice as to this patent, so that complainant, if it chooses to do so, can bring its suit at law for infringement and damages.

As to the Strowbridge patent, the defendant, the Joliet Wire-check Rower Company, admits by its answer the validity of this patent, and that it is manufacturing machines in accordance therewith, but claims to be the owner of said patent, and has filed its cross-bill asserting its own title, and denying complainant's title thereto, and praying that complainant's title may be set aside and held to be fraudulent and void as against the complainant in the cross-bill, and that the complainant in the cross-bill may be adjudged the lawful owner of said patent, and entitled to an accounting from the complainant in the original bill for the infringement of said patent. Under the issues made by this cross-bill voluminous proofs have been taken and discussed by counsel. The controversy involves certain dealings be-

tween Clarence S. Strowbridge and O. F. Hartwell, and Strowbridge and C. W. Dorr, and Dorr and the complainant in the original bill, and the effect of those dealings upon the title to the patent.

The facts, as they appear in the proof, seem to be that on August 24, 1881, Strowbridge was the owner of this patent, with the exception of the state of Massachusetts and some counties in New York, Michigan, and perhaps Iowa, and on said date he gave to Hartwell a contract in writing containing the elements of a power of attorney, and license, by which he empowered Hartwell, as his lawful attorney, to sell, transfer, and dispose of territory and shop rights to use said patent at prices to be approved by himself, (Strowbridge,) and to have and control the same for that purpose during the then unexpired term of the patent, for which Hartwell was to pay Strowbridge one-half of the proceeds of such sales, and Hartwell was also given the right to make and sell machines under the patent, for which he was to pay Strowbridge 50 cents for each machine so made and sold by him, with power reserved to Strowbridge to revoke the contract in case Hartwell should not faithfully perform his part thereof, or should not account for or pay over the money received by him, or in case Hartwell should discontinue said business or the manufacture of machines. At the time Hartwell obtained this contract Strowbridge resided in Cortland, New York, and Hartwell lived in Des Moines, Iowa, or soon after went there to reside; and about January, 1882, Hartwell entered into an arrangement with C. W. Dorr and Morton Mitchell by which they formed a corporation under the laws of Iowa, with a capital of $1,500, called the Des Moines Manufacturing Company, for the manufacture and sale of machines under the Strowbridge patent, each of the partners taking $500 of the capital stock of the company, and Hartwell assigning the contract between himself and Strowbridge to the company; and the company entered upon the business of manufacturing and selling machines made under this patent.

Neither the contract between Strowbridge and Hartwell, nor the assignment thereof from Hartwell to the Des Moines Manufacturing Company, was ever recorded in the patent-office.

The Des Moines Manufacturing Company commenced the manufacture of seeders under the patent, and made and sold for the season of 1882 about 175 machines, the royalty on which, under the Hartwell contract, amounted to $87.50, which was payable on November 1, 1882. In June, 1882, Dorr visited Strowbridge at his home in Cortland, and had some conversation with him about the business of manufacturing machines under the patent, and about some other patents in connection with the business, and expressed a willingness to buy the patent from Strowbridge if they could agree upon terms. He introduced himself to Strowbridge as Hartwell's partner, and in talking about the purchase used the word "we;" but no price or terms seem to have been mentioned, and certainly were not settled

or agreed upon at that time.    After Dorr returned to Des Moines he received a letter from Strowbridge, dated August 7, 1882, in which he says:

"What is the prospect of our making a deal on the power machine? I expect to go to Florida the forepart of September, and, if there is anything to be done, would like to hear from you as soon as convenient."

To this Dorr replied by letter dated August 10, 1882:

"I have just returned from my trip east, and will write you in a few days about the patent,—as soon as we make up our minds what we can do."

And on September 6, 1882, Dorr writes Strowbridge:

"We have thought the matter over a good deal, and have concluded to make you the following offer for the patent to the seeder: $500, (five hundred dollars,) to include the royalty due you this fall, which we will pay you as soon as due, and the balance July 1st, next.    This is with the understanding that you furnish us an abstract of the title showing the title clear from the government.    Considering that ten of the fourteen years have expired, I think this is a good offer."

This letter was answered by Strowbridge under date October 18, 1882, in which he says:

"We will accept your proposition, and furnish all the required papers.    It seems a very small amount as compared with what we have spent on the machine, but we need the money, and necessity is a stern master."

To this letter Dorr replied by letter, dated October 24, 1882:

"Will consider the matter settled, and are ready to settle with you as soon as you get the papers, etc., which I trust will be all right.    You can send the papers to the Valley Bank of this place, where I will pay the money; or you can send them direct to me, and I will remit direct to you."

On November 15, 1882, Strowbridge forwarded by mail to the Valley Bank of Des Moines an assignment of the patent, with a letter of instructions as follows:

"*Valley Bank, Des Moines, Iowa:* Send you to-day an assignment of patent for C. W. Dorr, which you will please to deliver on receipt of $500, and remit the same, less your trouble, to me."

And on the same day Strowbridge wrote Dorr:

"Received the papers from Washington yesterday, and have had the assignment made to-day, and sent the same to the Valley Bank. *Made papers to you, and you can do with them as you wish.*"

Considerable correspondence then passed between Strowbridge and Dorr, running from November, 1882, to March, 1883, in regard to certain defects found by Dorr in Strowbridge's title; but finally, on March 31, 1883, Dorr paid to the bank $87.50 in money, and gave his note payable to Strowbridge, July 1st following, for $412.50, and the bank delivered the papers to Dorr, and remitted the note and the money, less one dollar for charges, to Strowbridge.    On the same day Dorr wrote Strowbridge:

"I have this day paid to the Valley Bank $87.50, the amount due you on first payment.    The balance you will see, by reference to my proposition which you accepted, was to be paid July 1st next, but it seems as though you

overlooked this, as you asked them to collect it all.   I have given a due-bill for the balance, as per the arrangement, which I trust will be satisfactory."

. The remittance from the bank was acknowledged by Strowbridge by a postal card dated April 6th, saying: "Your remittance of draft and note duly received.   Thanks."

After the bank had received this acknowledgment from Strowbridge, and about the twelfth of April, 1883, Dorr caused the deed from Strowbridge to himself to be recorded in the patent-office. Strowbridge indorsed and negotiated the note at a bank in Cortland, and obtained the amount called for by the note, less the usual discount.   About the time the note matured it was sent to the Valley Bank for collection, and payment refused by Dorr until Strowbridge should correct or explain satisfactorily some further alleged defects in his title, which Dorr claimed had come to his knowledge after the note was given.   The president of the bank wrote to Strowbridge, in substance, that Dorr's paper was good, and that Dorr was only waiting for Strowbridge to fix his title.   Several letters then passed between Dorr and Strowbridge in regard to the alleged defective title, and, finally, under date of July 30, 1883, Strowbridge wrote to the president of the bank:

"Have just written Dorr, but cannot see anything in his correspondence why you should not receive your pay from him.   We certainly have no deal with him at present, and it is for you to get the money as soon as you can. *We certainly must look to you, for our deal closed as soon as you delivered the papers.*   If we had wanted his note, what object in sending the papers to you?"

The correspondence between Dorr and Strowbridge in regard to the alleged difficulty in the title was continued for some months after this time, it being insisted by Dorr that a man named Bartholomew had asserted title to the patent for all the New England states, while Dorr claimed that he had bought with the understanding that this territory had not been sold, or only a very small portion of it; but no adjustment of the difficulty was reached, and no further payment made by Dorr, but Strowbridge seems to have collected $100 from Bartholomew, and credited it to Dorr on the note; and on November 12th he wrote Dorr, in substance, that the balance due was $314, which he thought was little enough for the patent.

During the spring of 1883 the Des Moines Manufacturing Company, or the firm of C. W. Dorr & Co., composed of C. W. Dorr and Morton Mitchell, which seems to have managed the affairs of the company, sold about 800 machines, parts of which had been made for them by the firm of Freeman & Sons, of Racine, Wisconsin; and the business prospects had so much improved that they proposed to make 5,000 machines for the market of 1884, and in the summer of 1883 a contract was made with Freeman & Sons to manufacture this number of machines.   It is difficult to determine accurately from the testimony just who were the parties to this contract, but it seems

to have been negotiated mainly, and the terms settled, by correspondence, some of the letters being signed by C. W. Dorr, and others C. W. Dorr & Co.; the final letter of July 14, 1883, in which the proposition of Freeman & Sons was accepted, being signed by Dorr only. But the proof also shows that both Dorr and Hartwell visited Racine during the summer of 1883, and conducted orally some negotiations connected with the contract. It also appears from the proof that Dorr, or the firm of C. W. Dorr & Co., mainly managed and controlled the business affairs of the Des Moines Manufacturing Company. In the early part of November, 1883, and after Freeman & Sons had made considerable progress toward the execution of their contract for 5,000 machines, they became doubtful of the credit of Dorr, or Dorr & Co.; and were unwilling to deliver the machines to them, and take the risk of making collections from them; and proposed that a corporation should be formed under the laws of Wisconsin, with a capital stock of $60,000, and that the patent should be conveyed to this company, and that the business of the manufacture of seeders under the patent, and the further execution of the contract for 5,000 machines, should be conducted by such company. This proposal was accepted by Dorr, who seems to have managed the entire negotiation in his own name, and without consulting Mitchell or Hartwell. The corporation was organized, and $30,000 of the stock of the company was issued to Dorr in payment for the patent, and the patent duly assigned and transferred to the company; Mr. Stephen Freeman becoming the president, Dorr the treasurer, and Charles Freeman secretary, of the company; and the remaining $30,000 of the capital stock of the company was issued to Stephen Freeman and his two sons, Charles and Michael, for which they gave their notes.

From the time the Racine Seeder Company was so organized the business of the manufacture and sale of seeders under said patent has been conducted in the name of this company, and the company, fearing some difficulty by reason of interference between the Floyd patent and the Strowbridge patent, purchased the former. After the organization of this seeder company the Des Moines Manufacturing Company ceased to make or sell machines, and Dorr purchased Mitchell's stock in the latter company, and offered to purchase the stock of Hartwell, and his offer was accepted by Hartwell, but the proposition was not consummated because Hartwell had pledged his stock, and he was unable to deliver it. Subsequently, Hartwell filed a bill in the circuit court of Polk county, Iowa, against the Des Moines Manufacturing Company and Dorr, charging Dorr with fraud in managing the affairs of said company, and asking the appointment of a receiver to wind up its affairs; and under the proceeding in that case a decree has been entered setting aside the assignment of the Hartwell contract from Hartwell to the company, and transferring the contract back to Hartwell.

After the assignment of the patent by Dorr to the Racine Seeder Company, and the record of such assignment, Hartwell, with the consent of Strowbridge, assigned his contract with Strowbridge to the complainant in the cross-bill; and on January 10, 1885, Strowbridge assigned and transferred to the complainant in the cross-bill the patent in question, together with all rights accruing to him thereunder, and authorized the complainant in the cross-bill to prosecute any and all necessary actions in any courts to annul and set aside any and all transfers theretofore made of said patent.

It is claimed on the part of the complainant in the cross-bill that the assignment of the patent in question was obtained from Strowbridge by the false and fraudulent pretense on the part of Dorr that he was purchasing it for the joint interest of himself and Hartwell, when in fact he was making the purchase without the knowledge of Hartwell, and with intent to defraud him; that the assignment of the patent was sent to the Valley Bank with instructions not to deliver it until the $500 purchase money was paid; and that the bank, in violation of these instructions, delivered the assignment to Dorr without such payment; and that Dorr thus became possessed of the deed to the patent by his own fraud; and that the Racine Seeder Company is not the purchaser of the patent in good faith, for value; but that the company was only organized to hold the patent and conduct the business of manufacturing under it as a mere convenience to enable Dorr and the Freemans to defraud Strowbridge, Hartwell, and the Des Moines Manufacturing Company.

As to the first proposition, that Dorr led Strowbridge to understand and believe that he was buying the patent for the joint account of himself and Hartwell, there is a conflict of evidence as to what was said between Dorr and the Strowbridges at the time of Dorr's visit to them in the summer of 1882; the testimony of the Strowbridges tending to show that Dorr claimed to be acting for Hartwell as well as himself, while Dorr testifies he did not so represent. I do not find it necessary, for the purposes of this case, to pass upon this conflicting proof, as it is enough to say that no bargain was made between Dorr and Strowbridge until after Dorr returned home to Des Moines, and the letters which passed between the parties are the evidence of what the bargain between them was. In Dorr's letters to Strowbridge he uses the words "we" and "our" as if more than himself were interested, and it is possible enough was said in the previous personal interviews and conversations to lead Strowbridge to infer that Hartwell was included in these words; but when the terms of purchase were finally agreed upon, and Strowbridge, by his letter of November 15, 1882, notified Dorr that he had sent the assignment to the Valley Bank, he said: "*Made the papers to you, and you can do with them as you wish.*" Here seems to me to be a complete answer to all claim that Dorr was buying in the interest of Hartwell, as the entire question as to who should have the benefit of the purchase was relegated to Dorr

to do as he chose with it. No suggestion was made that Hartwell was to be considered in the matter, or his interest protected, and although Strowbridge and Hartwell were old friends, he was not notified or informed by Strowbridge of the sale of the patent, and no steps taken to give him to understand, or inform him in any way, that the conveyance had been made to Dorr; and it does not, as it seems to me, lie in the mouth of Strowbridge, or any one claiming under him, after these utterances, to complain of fraud, because Hartwell has not been allowed to share in the purchase of the patent. It must be remembered that Hartwell had at this time assigned his contract with Strowbridge to the Des Moines Manufacturing Company, although the proof does not show that Strowbridge had assented to such assignment, or even knew of it; and I think it more probable that Strowbridge supposed or assumed that the manufacturing company was to be interested, if anybody in the purchase, rather than Hartwell. But however that may be, the unquestioned fact is that through all the correspondence between Strowbridge and Dorr about this purchase Hartwell's name is not mentioned as a party in interest, and Strowbridge, without instruction or request to do so, from Dorr, makes the deed to Dorr alone.

As to the second point, it is quite clear that Dorr's offer of September 6, 1882, was to pay the royalty on the 175 machines when due, which was the first of the following November, and the balance on July 1, 1883. The payment of the royalty was delayed until March 31, 1883, but when paid Strowbridge accepted it, and accepted the note due on the first of the next July. It is also, as I think, conclusively shown from the proof that Strowbridge knew from some source that the bank had delivered the deed of the patent to Dorr at or soon after the payment of the money and the signing of the note of March 31st, because Strowbridge's letter to the bank, of July 30th, clearly shows that he knew the deed had been delivered by the bank to Dorr, and he assumes that the bank had thereby made itself liable to pay the note. It is true that Mr. Strowbridge testifies that he had no knowledge that the deed had been delivered by the bank to Dorr until November, but this letter of July 30th seems to me unanswerable upon this question, and I have no doubt Strowbridge did know of the delivery of the deed to Dorr very soon after the fact occurred. By the delivery of the deed to Dorr he was clothed with all the evidence of title to the patent which Strowbridge could give him, and he (Strowbridge) must have understood and known, for he seems from the testimony and letters to have been an unusually intelligent and capable business man, that he had only Dorr's note to rely upon for payment of the balance of the purchase money due him. Strowbridge must have known, as I have said, that the deed had been delivered to Dorr; and yet he took no steps to recover it, or prevent Dorr from making such use as he (Dorr) should see fit, and allowed Dorr to stand as the apparent owner until November, 1883, when Dorr conveyed the title

to the Racine Seeder Company, and that company has held the title since that time. The fact that the Racine Seeder Company was organized for the purpose of taking the title to this patent, or with the understanding that it was to take the title to the patent, and from that time conduct the business of manufacturing under the patent, and that it paid for the patent by the issue of half its capital stock to Dorr, is no evidence of fraud or bad faith as against the seeder company. Having become a corporate entity with power to contract debts and liabilities and to conduct business, this Racine Seeder Company stands in the same position that an individual would stand in who had purchased this patent from Dorr in good faith. It seems to me that even if the bank did disregard Strowbridge's instructions, and deliver the deed without requiring the payment of purchase money, instead of holding the deed as collateral to Dorr's note, Strowbridge knew of this action of the bank, and elected to take his chance of collecting the note from Dorr. In other words, he treated the note as payment as far as the delivery of the deed was concerned, and cannot be allowed, even as against Dorr, to treat the deed as having been obtained by such fraud as would vitiate it in Dorr's hands. It is possible that if, while the title remained in Dorr, Strowbridge had taken his steps to establish a vendor's lien on the patent he might have done so; but he neglected to do this, and allowed Dorr to deal with the patent as its absolute and unconditional owner, and, so dealing with it, Dorr has conveyed it to a corporation competent to purchase and hold it, and that corporation has paid value for it in stock.

The proof shows that on August 16, 1883, Dorr wrote Strowbridge that nobody was responsible for the note but himself, and that if he (Strowbridge) would perfect the title he would pay the note; and the payment of the note and adjustment of the title was the subject of correspondence between them until two months before this litigation began, Dorr refusing to pay unless Strowbridge would first correct alleged defects in the title growing out of the Bartholomew claim to New England, and a disclosure that several counties in Iowa had been sold, of which, as was claimed, Strowbridge had not informed Dorr prior to the purchase; so that when, in November, 1883, Freeman & Sons, not being content to trust Dorr and his associates, if they knew he had any, to the extent of the 5,000 machines they had agreed to make, proposed that a corporation be formed, and the patent conveyed to it, I can see no ground upon which Strowbridge can complain of fraud in the transaction, as he had allowed Dorr to hold the title to it without question as to its validity in his hands, and his only claim was that there was a balance of $314 of purchase money yet due him, for which Dorr was personally liable, and which, for aught that appears, could have been collected by suit on the note. What title Strowbridge had seems to me to have been regularly and

properly vested in the Racine Seeder Company, and that company's title made a matter of record in the patent-office nearly two years before the complainant in the cross-bill obtained its conveyance from Strowbridge.

I come now to consider the question of the title of the complainant in the cross-bill as the assignee of the Hartwell contract with the consent of Strowbridge. By a decree of a competent court the Hartwell assignment to the Des Moines Manufacturing Company has been set aside, and he has been rehabilitated with the ownership of the contract, and this court cannot review that decree; but the Racine Seeder Company was not a party to the decree, and is not bound by it. Without discussing the question as to whether the contract between Strowbridge and Hartwell is a power of attorney coupled with an interest, and therefore not revocable except for some of the reasons provided for in the instrument itself, I am very clear that the contract, both as a power to sell and as a license, is a merely personal one, and not transferable by Hartwell except with the consent of Strowbridge. Curt. Pat. § 198; *Brooks* v. *Byam*, 2 Story, 545; *Consolidated Fruit Jar Co.* v. *Whitney*, 1 Ban. & A. 356. In view, then, of the nature of this contract, I am quite clear that when Strowbridge parted with his title to the subject-matter of the contract he parted with all right to sanction or vivify the assignment, or transfer of it from Hartwell to any one else; and conceding for the argument that the contract remained in force, and that the sale of the patent from Strowbridge to Dorr did not work a revocation of it, Hartwell could not sell territorial or shop rights, nor assign the right to manufacture, without the consent of the owner of the patent; and holding, as I do, that Strowbridge's deed to Dorr was operative to transfer the title in the patent to Dorr, and that the deed from Dorr to the seeder company placed the title in the seeder company, it follows that no transfer of the contract by Hartwell was valid without the consent of the seeder company.

Much of the testimony and discussion has related to the charge that Dorr was guilty of bad faith towards the Des Moines Manufacturing Company, and towards Hartwell and Mitchell, his associates in that company, in organizing the Racine Seeder Company, and transferring to it the business of the Des Moines Company and the Strowbridge patent; but these are questions which I deem wholly foreign to this case, and only proper to be considered in a suit by the Des Moines Company against Dorr or the Racine Company. If Dorr wronged the Des Moines Manufacturing Company or his associates, Hartwell and Mitchell, that wrong cannot aid the title which the Joliet Company now asserts by its cross-bill against the Racine Company. The Joliet Wire-check Rower Company must stand upon the title it got by the deed from Strowbridge and the assignment of the Hartwell contract, and as Strowbridge had no title when he made the deed to

that company, and the transfer of the Hartwell contract is not approved or assented to by the Racine Company, it follows that the complainant in the cross-bill took no title from either of these sources.

A decree will be entered dismissing the cross-bill for want of equity; and dismissing so much of the original bill as relates to the Floyd patent without prejudice; and finding under the original bill that the Strowbridge patent is valid, and the title thereto is in the complainant; and that the defendant, the Joliet Wire-check Rower Company, has infringed the same; and that complainant is entitled to an accounting for profits and damages.